PRESENT: Carrico, C.J., Compton, Lacy, Keenan, Koontz, and
Kinser, JJ., and Whiting, Senior Justice

SA'AD EL-AMIN

                                          OPINION BY
v.  Record No. 981994      SENIOR JUSTICE HENRY H. WHITING
                                     April 16, 1999

VIRGINIA STATE BAR, ex rel.
THE THIRD DISTRICT COMMITTEE


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
    Clifford R. Weckstein, Chief Judge Designate, Dixon L. Foster
            and J. Warren Stephens, Judges Designate

     Asserting that Sa'ad El-Amin, a lawyer licensed to practice

in Virginia, had violated certain of its disciplinary rules, the

Virginia State Bar initiated disciplinary proceedings against

him.  The preamble to the Virginia Code of Professional

Responsibility states, in pertinent part:

          The Virginia Code of Professional Responsibility
     consists of three separate but interrelated parts:
     Canons, Disciplinary Rules, and Ethical
     Considerations.

          The Canons are statements of axiomatic norms,
     expressing in general terms the standards of
     professional conduct expected of lawyers in their
     relationships with the public, with the legal system,
     and with the legal profession. They embody the general
     concepts from which the Disciplinary Rules and the
     Ethical Considerations are derived.

          The Disciplinary Rules, unlike the Canons and
     Ethical Considerations, are mandatory in character, as
     stated in DR 1-102(A)(1). The Disciplinary Rules state
     the minimum level of conduct below which no lawyer can
     fall without being subject to disciplinary action.

Rules of Supreme Court of Virginia, Pt. 6, § II.

In a hearing before a three-judge court conducted under the provisions of Code § 54.1-3935, the court concluded that El-Amin had committed 15 violations of 9 of the disciplinary rules in his representation of Annie H. Fant, Grace R. Williams, and Vernon El-Amin, and the court suspended his license to practice law for a period of four years.  El-Amin exercised his statutory right to appeal eight of those findings involving his alleged misconduct, competence and promptness, causing prejudice to a client, failure to refund advanced fees, and failure to avoid the appearance of professional impropriety.

In reviewing the findings of a three-judge court in an attorney disciplinary proceeding, we use the same standard that we apply to the findings of disciplinary boards:

> [O]n review we will make an independent examination of the whole record, giving the factual findings . . . substantial weight and viewing them as prima facie correct.  While not given the weight of a jury verdict, those conclusions will be sustained unless it appears they are not justified by a reasonable view of the evidence or are contrary to law.

Myers v. Virginia State Bar, 226 Va. 630, 632, 312 S.E.2d 286, 287 (1984)(quoting Blue v. Seventh District Committee, 220 Va. 1056, 1061-62, 265 S.E.2d 753, 757 (1980)(appeal from disciplinary board)).  And, consistent with well-established appellate principles, we view the evidence and all reasonable inferences that may be drawn therefrom in the light most

2

favorable to the State Bar, the prevailing party in the trial court.  Gunter v. Virginia State Bar, 238 Va. 617, 619, 385 S.E.2d 597, 598 (1989).

## I. The Fant Matter

Considering the cases arising under El-Amin's representation of each client, we begin with his representation of Fant.  Fant employed El-Amin in June 1994 to represent her in an employment discrimination case.  El-Amin agreed to begin working on the case immediately and required Fant to advance a retainer fee of $4,000, which she did by check.  He indicated to Fant that he would withdraw funds as he worked on the case and told Fant that he would deposit the retainer in an escrow account.  Instead, El-Amin cashed the check and produced no record of having deposited the proceeds in any account.

During the following five months, El-Amin had little contact with Fant, despite her numerous telephone calls, letters, and visits to his office.  Because of El-Amin's failure to respond to her inquiries, Fant wrote him a letter in late November 1994 discharging him as her counsel and asking for a refund of the retainer.  El-Amin telephoned Fant several days later and, admitting to her that he had not done certain work on the case as promised, agreed to refund "the money" by mail on December 5.

Fant testified that when El-Amin did not refund the money as promised, she sued him in the General District Court and mailed him a copy of the warrant. Thereafter, El-Amin contacted Fant and promised to pay "$4,000 on December the 20th, 1994, at 11 a.m." Fant went to El-Amin's office at the specified time and he told her that because his wife, who was his law partner, had been hospitalized, he had "taken [his wife's] load," and further that he could not charge Fant any money because he had done no work on her case.

However, El-Amin refunded only $1,000 at that time. In response to Fant's question of why the payment was in that amount in view of the fact that the $4,000 deposit was "supposed to be in escrow," El-Amin said "I don't have the money." El-Amin promised to pay the additional $3,000 on January 11, 1995 at 11:00 a.m.

When El-Amin failed to refund the remaining $3,000 on January 11, Fant wrote to the State Bar asking for its help in getting her refund. Although Fant delivered a copy of her letter to El-Amin's office on January 12, she received no response from him.

On January 17, Fant retained attorney Bradley O. Wein to collect the balance. El-Amin agreed to see Wein at a fixed time on January 23, 1995 in El-Amin's office and to pay the $3,000 balance to Wein at that time. However, El-Amin was not at his

office at the appointed time and did not refund the promised sum.

Only after Wein had generated a file of over 1,000 pages, expended more than 100 hours during a period of 18 months, and incurred costs of $754.72 did El-Amin refund $2,500 of the $3,000 balance in settlement of Fant's claim. After the deduction of Wein's fee and expenses, Fant realized only $911.95 of the $3,000 balance of her deposit.

El-Amin has not appealed three of the court's four findings in the Fant matter. They are that he violated the following disciplinary rules: (1) DR 9-102(A)(2), which requires that client funds be deposited in an identifiable trust account; (2) DR 9-102(B)(3), which requires that a lawyer maintain "complete records of all funds, securities, and other property of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them"; and (3) DR 9-102(B)(4), which requires that an attorney "[p]romptly pay or deliver to the client . . . funds . . . in the possession of the lawyer which such person is entitled to receive."

El-Amin contends, however, that the evidence is insufficient to establish, clearly and convincingly, that he violated DR 1-102(A)(3), which proscribes a lawyer's commission of a "deliberately wrongful act that reflects adversely on the lawyer's fitness to practice law." We disagree with El-Amin.

5

In our opinion, the evidence that El-Amin cashed Fant's $4,000 retainer check, used the proceeds without earning the fee, and delayed refunding the retainer fee, sufficiently supports the finding that he committed "a deliberately wrongful act that reflects adversely on [his] fitness to practice law," in violation of DR 1-102(A)(3). Accordingly, we will affirm the trial court's finding on that issue.

## II. The Williams Matter

We next consider the charges relating to El-Amin's representation of Williams, which began in early May of 1994. Williams, like Fant, employed El-Amin to represent her in an employment discrimination case.

As in the Fant matter, El-Amin appeals only one of the findings of disciplinary rule violations in his representation of Williams. He has not appealed the court's findings that, in representing Williams, he violated the pertinent provisions of the following disciplinary rules: (1) DR 2-108(D), which provides that, "[u]pon termination of representation, a lawyer shall take reasonable steps for the continued protection of a client's interests, including . . . refunding any advance payment of fee that has not been earned."; (2) DR 6-101(B), which states that a "lawyer shall attend promptly to matters undertaken for a client"; (3) DR 6-101(C), which provides that a "lawyer shall keep a client reasonably informed about matters in

6

which the lawyer's services are being rendered."; and (4) DR 9-102(B)(4), which requires that a lawyer promptly pay to a client funds the client is entitled to receive.

Thus, the appeal in the Williams matter is limited to the court's finding that El-Amin violated DR 1-102(A)(4). It prohibits a lawyer from engaging "in conduct involving dishonesty, fraud, deceit, or misrepresentation which reflects adversely on a lawyer's fitness to practice law."

At the initial consultation, El-Amin told Williams his fee would be $7,000. When she told him that she did not have "that kind of money," but would ask her relatives to help her make payments on the fee, El-Amin agreed that he would begin working on the case. Williams and her relatives paid El-Amin over $1,700. However, despite numerous office visits and telephone calls, Williams was unsuccessful in her attempts to see or talk to El-Amin about what he had done during the ensuing five-month period. Consequently, Williams wrote El-Amin on November 2, 1994, discharging him as her counsel and asking for a refund of the amounts paid on the fee. The letter was delivered by certified mail to El-Amin's office and signed for by his secretary on November 3, 1994. El-Amin did not respond to the letter.

El-Amin testified that his secretary neither gave him the certified letter nor told him of Mrs. Williams' office visits

7

and that he did not know he "had a problem with Mrs. Williams until after [he] received a complaint from the Virginia State Bar." Although El-Amin claimed he had done some research on the Williams case, he produced no records to substantiate his testimony and admitted that "the entire situation fell through the cracks. And it just did. And I don't have an explanation."

Yet when interviewed during a preliminary investigation about his failure to refund the fee, El-Amin told a State Bar investigator that he had not refunded the money because "he felt like he had earned the fees" up to the time of his discharge. Although El-Amin denied making this statement to the investigator and claimed that the money was still in an escrow account, at trial El-Amin produced no records of any such account and could only say that he "assume[d]" the money was still there.

In our opinion, this evidence clearly and convincingly supports the conclusion that El-Amin violated DR 1-102(A)(4) by using the retainer without earning it and by attempting to deceive the investigator in claiming the retainer had been earned. That is "conduct involving dishonesty, fraud, deceit, or misrepresentation which reflects adversely on [El-Amin's] fitness to practice law". DR 1-102(A)(4). Hence, we will affirm this finding.

III. The Vernon El-Amin Matter

8

Finally, we consider El-Amin's dealings with his client Vernon El-Amin (Vernon), who is of no relation to him. At the time of their contract in 1990, Vernon was incarcerated following his convictions for four murders. Vernon was represented by other counsel in those criminal cases.

El-Amin and Vernon agreed that if Vernon's pending appeal of those convictions was unsuccessful, El-Amin would represent him in a habeas corpus proceeding claiming ineffective assistance of counsel. In the meantime, El-Amin was to secure the release of Vernon's 1986 Lincoln Continental from police impoundment, have the car put into condition to sell, deduct the cost thereof, and hold the net proceeds of sale as a retainer fee.

As it turned out, the appeal by other counsel was successful and El-Amin did little work on this matter. However, Vernon was again convicted on retrial, remained in confinement, and asked El-Amin to keep the retainer as a credit for future representation.

El-Amin obtained the car, had it repaired, and began using it himself. He later decided to trade the car for a newer one and received a credit of $4,636.04 on the purchase price of the newer car. The newer car was titled in El-Amin's name and he eventually executed a lien on that car in favor of another client. El-Amin did not note in his records or on the title to

9

the newer car that he held either the 1986 car or Vernon's interest in the proceeds, i.e., the credit, in trust. Nor did El-Amin deposit funds in his trust account once he received the credit. Although El-Amin testified in another proceeding in July 1991 that the agreed value of the car was "$10,000, less any amounts necessary to repair it and put it in marketable condition," he testified before the three-judge court in 1988 that the agreed value was $6,500 less the cost of repairs.

El-Amin contends that the court erred in finding he had violated six disciplinary rules during his representation of Vernon El-Amin. We do not agree with El-Amin. We conclude that clear and convincing evidence supports all of the trial court's findings.

Dealing first with violations of DR 1-102(A)(3) and DR 1-102(A)(4), discussed above, involving a "deliberately wrongful act," deceit and misrepresentation, we reject El-Amin's argument that there is a distinction between his activities and the activities of other lawyers who committed crimes and were disciplined. As we pointed out in Gunter, 238 Va. at 621, 385 S.E.2d at 600, "conduct may be unethical, measured by the minimum requirements of the Code of Professional Responsibility, even if it is not unlawful." The evidence shows that El-Amin not only personally used Vernon's car, but he also traded it for a newer one without reflecting the resulting $4,636.04 credit on

10

the title to the newer car.  In our opinion, this sufficiently supports the trial court's findings of violations of both of these disciplinary rules.

We also conclude that the evidence was sufficient to show that El-Amin prejudiced Vernon's rights by using and disposing of the car in violation of DR 7-101(A)(3).  That disciplinary rule provides that a lawyer shall not intentionally "[p]rejudice or damage his client during the course of the professional relationship."  A comparison between El-Amin's 1991 testimony and his 1998 testimony concerning the value of the car, coupled with his decision not to reflect the unearned retainer or Vernon's consequent interest in the newer car, sufficiently indicates that Vernon's rights were prejudiced in this matter. It is of no consequence that El-Amin later earned the fee by handling other matters for Vernon, as he argues.  The fact is that at the time in question, Vernon's rights were prejudiced by El-Amin's activities.

The final group of charges arises under Canon 9, which provides: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."  One of the charges under this canon involves a violation of DR 9-102(A), which requires a lawyer to deposit "[a]ll funds received or held by the lawyer or law firm on behalf of a client . . . in one or more identifiable trust accounts."

11

El-Amin contends that he had no obligation to deposit funds to reflect the credit in question since the word "funds" as used in the rule refers to money and that, since he did not obtain money from the trade, but only obtained a credit, there could be no violation of DR 9-102(A).  We reject this contention for the following reasons.

The form of the retainer fee changed when El-Amin, who held Vernon's car as a bailee for the purpose of securing the payment of legal fees to be incurred in the future by Vernon, converted the car into a credit, which El-Amin received on the purchase of his new car.  Vernon had an interest in that credit because it took the place of his car as the retainer fee, or fund, for the payment of the future legal fees.

The terms "fund or funds" have been defined in part as "[a]n asset or group of assets set apart for a specific purpose."  Black's Law Dictionary 673 (6th ed. 1990).  Because the credit represented the retainer fee, it became a "fund" set aside for a specific purpose, the payment of fees to be billed by El-Amin in the future.

Considering the scope and purpose of the Code of Professional Responsibility, we do not think that the term "funds" as used in DR 9-102(A) is confined to items such as "money" or "cash," as El-Amin contends.  Indeed, we have not limited the term to money or cash, but, instead, have used the

12

term "fund" or "funds" in a generic sense in a number of situations.  See, e.g.,  Somers v. Godwin, 182 Va. 144, 147, 27 S.E.2d 909, 910 (1943)(applying word "funds" to intangible personal property); Fireman's Mutual Aid Assoc. v. Commonwealth, 166 Va. 34, 36, 184 S.E. 189, 190 (1936)(applying word "funds" to "bonds, notes, etc., and money");  Rixey's Ex'rs v. Commonwealth, 125 Va. 337, 343-44, 99 S.E. 573, 574 (1919)(describing intangible property held by executor as "funds arising from . . . the sales of real and personal property to others").

In sum, given the context and purpose of the disciplinary rules, and our previous uses of the words "fund" and "funds," it is our opinion that, under the facts of this case, the credit El-Amin received upon trading Vernon's car became "funds" within the meaning of DR 9-102(A)(2) and that the rule required El-Amin to deposit a sum representing that credit into his trust account.

The evidence also supports the conclusion that El-Amin violated DR 9-102(B)(2), which requires that a lawyer "[i]dentify . . . properties of a client . . . and place them in a . . . place of safekeeping as soon as practicable."  El-Amin testified that "at first I was going to drive the vehicle. However, and I drove it."  But after an encounter with a man who "look[ed] very angry" and asked him if the car was Vernon's and

if El-Amin was related to him, El-Amin decided, "I don't want to have anymore parts of this. So I rapidly ran out to Capital Lincoln and said, 'What will you give me for this vehicle.'" El-Amin's personal use of the car and his failure to document Vernon's interest in the credit El-Amin received for selling the car sufficiently show that El-Amin failed to identify the car or the proceeds from its sale as Vernon's property or keep either in "a place of safekeeping," all in violation of DR 9-102(B)(2).

Finally, we consider the violation of DR 9-102(B)(3). It requires a lawyer to "[m]aintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them." El-Amin simply argues that "[t]he evidence established that El-Amin maintained records regarding the car given by Vernon El-Amin," but El-Amin does not say what those records were.

El-Amin was the only witness who testified about the records regarding Vernon's car. El-Amin's testimony indicated that he regarded his record-keeping obligation to Vernon as limited to accounting for the repair expenditures and that this obligation was discharged by notations of Vernon's name on the checks he had written on his attorney trust account to pay for the repairs to Vernon's car. Although no monies had been deposited in the trust account in Vernon's name, El-Amin said he

14

charged the amounts of these checks against other clients' retainer fees that had been earned by El-Amin. El-Amin says nothing about his obligation to keep a record of the agreed amount of the retainer or the work El-Amin had done to earn the retainer. We conclude that this evidence sufficiently supports the conclusion that El-Amin violated the provisions of DR 9-102 (B)(3).

## IV. Length of Suspension

El-Amin argues that "[t]he trial court abused its discretion in failing to consider El-Amin's mitigating circumstances." He overlooks the following statement made by the court at the time the sanctions were imposed. "We have taken into account the evidence in aggravation and the evidence in – and argument in mitigation." Accordingly, we reject El-Amin's argument.

Even so, El-Amin contends that the four-year suspension was unwarranted in view of the mitigating evidence of his wife's and daughter's illnesses during the periods in question, the revision of his office procedures to provide that he alone would sign for certified letters addressed to him, his remorse, and his refunds to Fant despite having done considerable work for her. The State Bar responds that El-Amin's "revision" of his office procedures was merely an avoidance of future responsibility, and that his alleged remorse was put in question

15

because even after protracted litigation he refunded only a portion of Fant's retainer.  These considerations may well have diminished the effect of any mitigating evidence presented by El-Amin.

El-Amin also contends on brief that "[t]here was no evidence of a pattern of misconduct by El-Amin."  In response, the State Bar notes the evidence in the record of his "prior record since 1987 includ[ing] no less than seven founded disciplinary violations relating, like [these], to client neglect; failure to keep clients informed; failure to account for fees collected; and failure to refund unearned fees, among other things."  We think this evidence is sufficient to establish a pattern of misconduct.

In sum, our independent review of the entire record discloses that the court did not abuse its discretion in suspending El-Amin's license for four years.

### V. Conclusion

Finding no merit in El-Amin's assignments of error, we will affirm the judgment of the court below suspending El-Amin's license to practice law for a period of four years.

Affirmed.

16